528 A.2d 268

The Bell Telephone Company of Pennsylvania, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued February 25, 1987, before President Judge CRUMLISH, JR., Judges CRAIG, MACPHAIL, DOYLE, BARRY, COLINS, and PALLADINO.

*Thomas L. Welch,* with him, *Julie A. Conover, William L. Leonard, Judith N. Dean, J. Lindsay Johnston, Daniel E. Monagle,* and *Richard D. Spiegelman,* for petitioner.

*John A. Levin,* with him, *Kenneth L. Mickens,* Assistant Counsel, *Bohdan R. Pankiw,* Assistant Counsel, *Albert W. Johnson, III,* Deputy Chief Counsel, and *Charles F. Hoffman,* Chief Counsel, for respondent.

*H. Kay Dailey,* Assistant Consumer Advocate, with her, *Debra M. Kriete* and *Daniel Clearfield,* Assistant Consumer Advocates, *David M. Barasch,* Consumer Advocate, and *Edward J. Riehl* and *William S. Reyner,* for intervenor, *David M. Barasch,* Consumer Advocate.

OPINION BY JUDGE CRAIG, June 19, 1987: .

The Pennsylvania Public Utility Commission, by its order of October 24, 1985, granted an increase in the annual revenues of the Bell Telephone Company of Pennsylvania amounting to $32.6 million. The Bell Telephone Company has appealed. The Consumer Advocate is an intervenor.

On January 22, 1985, Bell had filed tariff revisions designed to produce approximately $325 million in additional annual intrastate operating revenues. The commission timely suspended the proposed rates until October 23, 1985, and instituted an investigation as to their lawfulness.

Following a pre-hearing conference, ten public input hearings and twenty-three formal evidentiary hearings (during which time Bell reduced its additional rev-

enue requirement claim to $237.4 million), the Administrative Law Judge issued a recommended decision proposing an allowance of an additional $47.3 million, out of the $237.4 million additional revenue request.

On October 24, 1985, the commission issued its opinion and order, concluding that Bell had demonstrated a need for additional annual revenues of $32.6 million.

On appeal here, Bell challenges the following four aspects of the commission's opinion and order: (1) the commission's decision to decrease Bell's rate base by approximately $37 million, with a reduction of Bell's allowed annual revenues by $9.4 million, based on a calculation of the value of Bell's station connections depreciation reserve, commonly referred to as the inside wire account, as of a date six months beyond the end of the test year; (2) the commission's disallowance of employee and pensioner discounts on telephone service, reflected as a $5 million dollar reduction in Bell's allowed annual revenues; (3) the commission's determination requiring Bell to use the flow-through method of accounting, rather than the normalization method of accounting, to calculate its income tax expense, reflected as a $28.9 million reduction in Bell's allowed annual revenues; and (4) the commission's decision to require Bell to amortize certain accumulated deferred tax balances over a five-year period, reflected as a $26.7 million decrease in its allowed annual revenues.

In rate cases, this court's scope of review is limited to a determination of whether the commission violated constitutional rights, committed an error of law, or made findings which are not supported by substantial evidence. *Bell Telephone Company of Pennsylvania v. Pennsylvania Public Utility Commission*, 83 Pa. Commonwealth Ct. 331, 478 A.2d 921 (1984).

### Inside Wire Account

Inside wiring consists of the wire inside each customer's premises and some associated equipment. Until 1981, Bell's investment in inside wiring, including the costs of associated labor, was capitalized according to accounting methods which the Federal Communications Commission prescribed. The effect of allowing capitalization of inside wire expenditures was that all ratepayers were paying for the repeated connections of a small proportion of customers who connected and disconnected their service more frequently than the average customer. In 1981, the Federal Communications Commission determined that any future expenditures for inside wiring should be treated as expenses rather than capitalized. As of January 1, 1984, the company was to treat the cost of all new connections as expenses, and the company was permitted to recover, over a ten-year period, any existing investment in inside wiring. In October 1981, the Pennsylvania Public Utility Commission also adopted corresponding changes in the accounting method for inside wiring.

On appeal here, Bell challenges the commission's reduction of Bell's claimed rate base by $37 million to reflect the balance in the inside wire account as of March 31, 1986, a point six months beyond the end of the future test year used in this rate case.

There is no dispute that the commission has the authority to make adjustments to a company's test year data. In *Bell Telephone Company v. Pa. Public Utility Commission,* 47 Pa. Commonwealth Ct. 614, 624, 408 A.2d 917, 923 (1979), this court stated that:

It is the Commission's duty to establish rates which are fair and reasonable and it may utilize any method of cost allocation which accomplishes this purpose and ensures a fair rate of

return to the utility company. Further, the fundamental purpose of the test year is to provide a basis for making the most accurate forecast of a utility's rate base, revenues and expenses in the near future when the prescribed rates are to be in effect and to the extent that revenues and expenses for the test year do not accurately indicate future revenue and cost trends the Commission has the duty to make adjustments.

Bell argues that the commission's decision to value the inside wire account on March 31, 1986, instead of March 31, 1985, had the effect of denying Bell an opportunity to earn a return on its inside wire account for those twelve months. Although Bell acknowledges that the commission has the discretion to make post test year adjustments, *Green v. Pennsylvania Public Utility Commission,* 81 Pa. Commonwealth Ct. 55, 473 A.2d 209 (1984), Bell contends, in its brief, that such discretion "does not permit the Commission to single out one cost element for the sole purpose of reducing revenue requirements by choosing to value certain kinds of property at a date outside of the test year." Bell's inside wire account is considered a "dying account" because its value is steadily declining and will attain zero value in 1992. Bell contends that the value of other elements of the rate base would be increasing over the same period of time that the wire account is decreasing, apparently to make the point that the offsetting effect negates the need for, or validity of, special treatment of the wire account.

Contrary to Bell's contentions, the commission did not single out the inside wire accounts as the only property whose valuation date was beyond the end of the test year. Bell itself chose that March 31, 1986 valuation date for two other dying accounts—cross-bar and step-by-step-central office equipment—and a company wit-

ness testified that the company chose that March 31, 1986 valuation date for those two accounts in order to avoid overstating the company's depreciation expense. The commission reasonably preferred to value the wire account as of the later date to reflect its diminished value during the period the rate increase would be in effect. Hence, the commission did not abuse its discretion in adjusting for conditions beyond the test year.

### Discounted Telephone Service to Employees

The commission adjusted Bell's test year revenues and expenses relating to discount telephone service which Bell offers to its employees. Concluding that Bell had failed to prove that discount telephone service was necessary to provide service to the public, the commission imputed $4,634,000 in additional revenues and deducted $671,000 in related expenses to eliminate the impact of that discount telephone service.

Historically, the commission has held that ratepayers should not be required to subsidize telephone service discounts to employees, and the commission has repeatedly imputed the costs of those services in revenues and has disallowed all expenses relating to discount service. However, the commission may not refer to a previously adopted policy as the sole basis for making an adjustment, nor can the commission substitute that policy for evidence in a proceeding before it. *Aizen v. Pennsylvania Public Utility Commission*, 163 Pa. Superior Ct. 305, 316, 60 A.2d 443, 449 (1948).

Although the commission stated in its opinion that the approval or disapproval of the telephone service discount claim is a decision within its sound discretion, we must conclude that the commission erred as a matter of law on this point. The commission's exercise of discretion on the basis of adherence to a past policy is not without limitations. *Butler Township Water Company v.*

*Pennsylvania Public Utility Commission*, 81 Pa. Commonwealth Ct. 40, 44, 473 A.2d 219, 222 (1984).

In *Bell Telephone Company v. Pa. Public Utility Commission*, 47 Pa. Commonwealth Ct. 614, 408 A.2d 917 (1979), this court affirmed the commission's disallowance of that very same telephone service discount expense. There, we adopted the commission's reasoning that the ratepayers should not be required to pay for the "Company's largesse." Recognizing that employee discounts are not discriminatory when those discounts compensate employees for wages which would be higher otherwise, we stated in that *Bell* decision that "in the instant case there is simply no evidence to support the hypothesis that eliminated discounts will trigger such [higher wages] demands." *Bell* at 628, 408 A.2d at 925.

The legal status of discounted employee service here is different from the situation involved in that earlier *Bell* decision. The commission has previously classed discount service to employees as a company gratuity. However, that discount is now contractually required under the collective bargaining agreement. Although the commission here has acknowledged that the employee discount service expense changed from a gratuity to one for which a legal entitlement existed, it commented further that there was no reason why what was once considered an unnecessary expense should now be considered a necessary one. We disagree.

Recognizing that a utility's prudence in incurring certain expenses confers upon the utility no guarantee that it will recover those expenses from its customers. *Duquesne Light Company v. Pennsylvania Public Utility Commission*, 96 Pa. Commonwealth Ct. 398, 507 A.2d 1274 (1986), we nevertheless conclude that Bell has met its burden of demonstrating that discounted telephone service is a necessary expense rationally re-

lated to the company's provision of service to the public. The record indicates that a union representative testified that he would object to the company's elimination of that discount service without replacement of it with a benefit of equal value. Although the trial staff and OCA make light of this small excerpt of testimony, how else can the company demonstrate "that discontinuance of employee discounts will cause employees to demand the equivalent dollar value in higher wages . . . ?" *Bell* at 628, 408 A.2d at 925.

Moreover, the commission's reservations, as to whether the discount telephone service was an item for which management bargained in good faith during its labor negotiations, are inappropriate. If this court were to allow the commission to question management's sincerity during collective bargaining negotiations, the necessary result—allowing the commission to use such a subjective analysis unsupported by facts—would go beyond our existing broad deference to commission discretion. Additionally, trial staff's comment in its brief that in "an industry where the total number of employees is declining, management may be able to eliminate the discount at less than its equivalent in increased wages or for no increase at all" is inappropriate in light of the trial staff's duty to assist in the development of, and challenge of, all matters in the public's interest. 66 Pa. C. S. §308(b). Bell employees are also members of the class whose interests trial staff has a duty to protect. Trial staff's position that, because of current economic conditions including the weak job market, Bell employees might be willing to give up an item such as discounted telephone service in exchange for nothing, other than the preservation of their employment, is not acceptable as rate-making advocacy "in the public's interest."

Accordingly, we find that the inclusion of discount telephone service in Bell's collective bargaining agreement with its employees, together with evidence of employee unit objections to the company's elimination of that benefit without replacement, satisfies Bell's burden of providing evidence to demonstrate "that discontinuance of employee discounts will cause employees to demand the equivalent dollar value in higher wages." *Bell* at 628, 408 A.2d at 925. Accordingly, we must reverse the commission's actions relating to employee discount service.

### Flow-Through, Rather Than Normalization, of Bell's Tax Expenses

The commission determined that, based upon the Supreme Court's decision in *Barasch v. Pennsylvania Public Utility Commission,* 507 Pa. 496, 491 A.2d 94 (1985), Bell was required to flow-through, rather than normalize, all of its state and federal income tax expense. The commission also determined that Bell was required to flow-through the deferred state and federal income taxes related to vacation pay timing differences, and deferred state and federal income taxes relating to capitalized construction overheads.

Normalization is a rate-making concept designed to adjust a utility's operating expenses in its test year. As applied to income tax expense, normalization permits a public utility to include in its current rate base an income tax expense higher than that which it has been required to pay on the assumption that the taxes saved by accelerated depreciation are merely deferred.

Under the flow-through ratemaking method, where income taxes have been calculated using a higher accelerated depreciation for tax purposes, the income tax expense of the company to be recovered from ratepayers has been lower in the early years of an asset's life and

higher in later years. The benefit of the higher accelerated tax depreciation flows through to the ratepayer in the form of lower rates in the beginning of the asset's life. J. H. Cawley and N. J. Kennard, Rate Case Handbook, Appendix C (1983).

There is no dispute that the Supreme Court determined in *Barasch* that if normalization violates the "actual taxes paid" doctrine, a decision to permit normalization is not necessarily a matter within the commission's discretion. *Barasch* at 521, 491 A.2d at 106-107. Moreover, the Supreme Court recognized a single exception to the "actual taxes paid" doctrine with respect to state income taxes, determining that (unless there is some extraneous penalty such as that which Congress imposed with respect to post-1980 property) the commission could only find rates "just and reasonable" if those rates are based on the "actual taxes paid" doctrine. *Barasch* at 521, 491 A.2d at 107.

Bell argues that the amortization method is consistent with generally accepted accounting principles, and that amortization would benefit its ratepayers. Bell further argues that the *Barasch* precedent requiring flow-through accounting should not apply to it because of Bell's status in the telecommunications industry, where many companies are now not regulated and therefore can use the amortization method of accounting. Because that issue is pending before the Supreme Court,[1] this court is constrained to follow the *Barasch* precedent and will not address Bell's argument that *Barasch* is not controlling here with respect to the flow-through accounting of Bell's income tax expense.

---

[1] *Bell Telphone Company of Pennsylvania v. Pennsylvania Public Utility Commission,* 83 Pa. Commonwealth Ct. 331, 478 A.2d 921 (1984), *allocatur granted,* Nos. 13 & 14 M.D. (Pa. 1985).

With respect to vacation pay accruals, Bell asserts that their tax impact should be normalized because the record indicates that the accrual for vacation pay reverses each year.

For federal income tax purposes, Bell obtains a tax benefit from a deduction for vacation pay accrual expenses one full year before that amount is recorded on Bell's books. Bell defers those tax benefits into the future, and does not immediately pass on to its ratepayers the tax benefits which it receives for that deduction.

Because the commission, as factfinder, found that there was insufficient evidence to demonstrate that Bell's vacation pay accruals would reverse and be reduced in the near future, the commission appropriately required Bell to flow-through the tax timing benefits derived from vacation pay accruals.

Accordingly, we must affirm the commission's application of the "actual taxes paid" doctrine by requiring Bell to flow-through all of its tax timing benefits to its ratepayers, including those benefits relating to vacation pay accruals.

## The Commission's Choice of a Five-Year Amortization Period for the Accumulated Deferred Tax Reserve

Finally, Bell challenges the commission's choice of a five-year amortization period for its accumulated deferred tax reserve. Bell accrued that accumulated deferred tax reserve because the commission permitted Bell to normalize, rather than flow-through, its income expense in earlier rate cases.

There is no dispute that *Barasch* does not require the use of a five-year amortization period. However, the commission's rationale for a five-year amortization period is consistent with the "actual taxes paid" doctrine—the commission's explanation being that the five-year period was "to maximize the opportunity for a

return of those funds to the ratepayers who provided them, over a reasonable period of time without creating a hardship for the Company."[2]

Bell further argues that the commission's choice of a five-year amortization period is inconsistent with a recent commission order[3] which permitted Continental Telephone Company to amortize its deferred tax reserve over a sixteen-year period. Here, the commission determined that Bell had not demonstrated that it would suffer financial hardship as a consequence of the five-year amortization period. Although the relevant facts in *Continental Telephone Company* are not before us, we can logically assume that the evidence in that case could have indicated that Continental Telephone Company demonstrated a sufficient hardship, so that the commission's actions in *Continental Telephone Company* would not be controlling here.

Accordingly, we must find that the commission did not abuse its discretion in choosing a five-year amortization period to provide a greater probability that those ratepayers who made contributions into the deferred tax reserve will have those dollars returned to them.

### Summary

We conclude that substantial evidence supports the commission's order as follows: (1) choosing a valuation date for Bell's inside wire account six months beyond the end of the test year; (2) requiring Bell to flow-through all income tax expense; and (3) choosing a five-year amortization period for the accumulated deferred tax reserve. We further conclude that the commission

---

[2] Commission order at 106.

[3] *Pennsylvania Public Utility Commission v. Continental Telephone Company,* No. R-850044 slip opinion, dated February 6, 1986.

committed an error of law by disallowing all expenses, as well as imputing income, relating to discount telephone service for Bell employees.

Accordingly, we affirm in part and reverse in part.

ORDER

NOW, June 19, 1987, the order of the Public Utility Commission in *Pennsylvania Public Utility Commission v. The Bell Telephone Company* at R-842779 through R-842779CO24, dated October 24, 1985, is affirmed in all respects except as to the disallowance of $617,000 in expenses and the imputation of $4,634,000 in income relating to employee discounted telephone service, as to which the order is reversed. This case is remanded for recomputation accordingly.

Jurisdiction relinquished.

------

CONCURRING & DISSENTING OPINION BY JUDGE MACPHAIL:

I respectfully dissent only to that part of the majority opinion which reverses the Commission's actions relating to employee discount service. I do not agree with the majority that the Bell's employees are members of a class whose interest the Commission has a duty to protect nor do I agree with the majority that discounted telephone service to employees is a necessary expense rationally related to the company's provision of service to the public (majority op. ct. 41, 42).

Judge PALLADINO joins in this dissent.